UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ENERGY POLICY ADVOCATES, ) ) Plaintiff, ) ) v. ) ) SECURITIES AND EXCHANGE ) COMMISSION, ) ) Defendant. ) ) | Case No. 22-cv-01312 (APM) |

## MEMORANDUM OPINION

**I.**

This Freedom of Information Act ("FOIA") suit involves a demand by Plaintiff Energy Policy Advocates for (1) email communications between the White House and the former Chairman of the Securities and Exchange Commission ("SEC"), Gary Gensler, and three senior agency officials, and (2) the former Chairman's calendar entries. The SEC produced thousands of pages but withheld some in full and some in part based on various FOIA exemptions. What remains in dispute are the agency's withholdings based on the deliberative process privilege pursuant to Exemption 5. For the reasons that follow, the court enters partial judgment in favor of the SEC and requires the SEC to produce certain records for *in camera* review.

**II.**

**A.**

Exemption 5 provides that agencies need not disclose "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency[.]" 5 U.S.C. § 552(b)(5). Exemption 5 includes the deliberative process

privilege, which shields "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (internal quotation marks and citation omitted). The privilege is available only as to documents that are both pre-decisional and deliberative. *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 362 (D.C. Cir. 2021). A record is pre-decisional if it was "generated before the agency's final decision on the matter[.]" *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 268 (2021). And a record is deliberative when it is "prepared to help the agency formulate its position." *Id.*

"Assessing whether a record is pre-decisional or deliberative necessarily requires identifying the decision (and the associated decisional process) to which the record pertains." *Citizens for Resp. & Ethics in Washington (CREW) v. U.S. Dep't of Just.*, 45 F.4th 963, 972 (D.C. Cir. 2022). The agency asserting the privilege must "establish what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Senate of the Commonwealth of Puerto Rico ex rel. Judiciary Comm. v. DOJ*, 823 F.2d 574, 585–86 (D.C. Cir. 1987) (internal quotation marks and citation omitted). Put differently, the agency "bears the burden of establishing the character of the decision, the deliberative process involved, and the role played by the documents in the course of that process." *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984).

**B.**

To satisfy these requirements, the SEC has submitted a declaration from Mark Tallarico, an attorney in the SEC's Office of General Counsel, Decl. of Mark Tallarico, ECF No. 20-3 [Tallarico Decl.], along with two *Vaughn* indices identifying the information withheld under

Exemption 5—one for email communications and attachments, *id.*, Ex. 1, ECF No. 20-4 [hereinafter Ex. 1], and one for calendar entries, *id.*, Ex. 2, ECF No. 20-5 [hereinafter Ex. 2].

*Emails and Attachments.* As to the first set of records, Tallarico states that "[t]he withheld information and records reflect discussion between SEC staff, White House staff, and other federal government agencies' staff on various subjects, including potential areas of focus at policy meetings, development of policies, SEC proposed action and analysis, policy committees' meeting discussions and materials, and draft documents." Tallarico Decl. ¶ 11. He adds that "[t]hese discussions all occurred while the agencies were still in the process of determining which policy issues they should act on and what actions to take." *Id.*

The associated *Vaughn* index supplies additional details. It provides the date and time of the email; the authors and recipients as either SEC or White House staff, including who originated it; a general description of the email; and the "basis for withholding." Ex. 1 at 1. The "basis for withholding" as to each email attempts to justify why it is both pre-decisional and deliberative. Most entries generally explain that the email pertains to ongoing policy discussions before or during a meeting and that agency and White House staff continued to deliberate about the SEC's regulatory actions or policies. *See, e.g., id.* at 1 (entry 1), 2 (entries 4, 5), 3 (entries 6, 7), 5 (entries 8–10). Some go one step further and identify the general subject matter of the communication, as in the following examples: "climate-related matters," *id.* at 1 (entry 2); a "data gathering project to support regulatory matters," *id.* (entry 3); the "SEC's comments on a White House draft document," *id.* at 5 (entry 11); planning for a "non-public interagency policy committee meeting and policy development," *id.* (entry 12), 6 (entries 13, 14); "a non-public meeting about potential executive actions," *id.* at 7 (entry 15); the "SEC's submission to the Deputies Committee about potential executive and agency actions," *id.* at 8 (entry 19); "a future White House action," *id.* at

3

10 (entry 24); "White House request for SEC analysis of proposed regulations," *id.* at 12 (entry 29); and "call with Ukrainian National Securities and Stock Market Commission," *id.* (entry 30).

Tallarico provides various rationales for why disclosure would harm the decision-making process. He says that disclosure "would disrupt coordination between the White House and federal government agencies as they formulate Executive Branch policies and explore possible regulatory and executive actions." Tallarico Decl. ¶ 13. "[I]f White House and SEC staff knew such a public release was possible, they would be reluctant to offer their views and to rely on emails or other written communications to coordinate policymaking initiatives[.]" *Id.* ¶ 14. Such a chilling effect would "impede crucial coordination" among policy actors and "slow down the policy development process." *Id.* Disclosure also could "confuse the public by suggesting that proposals, views, and approaches that were dismissed or changed during the policy development process are still relevant." *Id.* ¶ 15; *see also id.* ¶¶ 16–17 (explaining adverse impacts of disclosing information from interagency policy committees and discussions between the White House and the SEC).

*Calendar Entries.* As to the former Chairman's calendar entries, Tallarico states that the withheld information "consists of information about meetings with SEC staff about SEC climate rulemaking" and "reflects SEC staff's discussions about various aspects of the proposed rulemaking prior to the release of that rulemaking." *Id.* ¶ 18. This withheld information is deliberative because it "reflects particular aspects of and language in SEC climate rules that the SEC staff were discussing" and "reflects deliberations about what particular issues related to the climate rulemaking the Chair and his staff should focus on as well as what matters the Chair may have been concerned about or needed more information about at particular times." Ex. 2 at 2 (entry 2). And those entries are pre-decisional because "because [they] concern[] intra-agency discussion about a proposed rule prior to its release." *Id.*

In addition, one calendar entry contains "an internal SEC email thread that reflects discussion about language in and edits to a draft of SEC climate-related rules." Tallarico Decl. ¶ 20. That entry is deliberative "because it reflects deliberations, proposals, and analysis about language in and edits to a draft of SEC climate-related rules" and is pre-decisional "because it concerns intra-agency discussion about a proposed rule prior to its release." Ex. 2 at 1 (entry 1).

Tallarico also explains the harm that would come from disclosing the calendar entries. He states that "[d]elineating in calendar entries" was an "efficient way for staff to clarify for Chair Gensler what his many meetings each day are about" and facilitate his engagement in those meetings. Tallarico Decl. ¶ 19. Disclosure "would likely limit the information [that staff] include in calendar entries" and "make it more difficult for staff, including the Chair, to keep track of and prepare for meetings." *Id.* "It would also impede efficient coordination between SEC staff on rulemaking and other agency initiatives." *Id.*

### III.

Plaintiff challenges the agency's withholdings under Exemption 5 on a host of grounds. The court addresses these arguments in the order in which they appear in Plaintiff's opposition brief. Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J., ECF No. 21 [hereinafter Pl.'s Opp'n].

### A.

First, Plaintiff argues that "the SEC has not bothered to explain who was making recommendations to whom in this case, much less whether the 'recommenders' were inside or outside the agency or what the relevant final decision was." *Id.* at 8. That is not correct. The relevant *Vaughn* index identifies as to each entry by whom and to whom (SEC staff or White House staff) the communication was written and the subject matter of the communication, which concerned policymaking by the SEC in general or as to a specific topic. Further, an agency does

not have to reach a "relevant final decision" for Exemption 5 to apply. *See Sears*, 421 U.S. at 153 n.18 ("Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process.").

Next, Plaintiff argues that "the SEC has not revealed how calendar entries, of all items, reflects recommendations or give-and-take." Pl.'s Opp'n at 8. But the agency has provided a detailed explanation of how the information withheld from calendar entries, if disclosed, would reveal the subject matter of ongoing discussions about climate-related rules that were not yet final, thus chilling the deliberative process. Tallarico Decl. ¶¶ 18–19 & Ex. 2. Courts have affirmed the withholding of calendar entries where, as here, the declarant and *Vaughn* index provide a sufficiently detailed explanation for the withholding, including the topic and decision-making process to which the entries relate. *See, e.g.*, *Inst. for Energy Rsch. v. FERC,* No. 22-cv-3420 (BAH), 2024 WL 551651, at *7–8 (D.D.C. Feb. 12, 2024) (permitting withholding of calendar entries under Exemption 5 where the agency had "identified a specific decision" and the topic of discussion was itself deliberative); *Am. Oversight, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. 17-cv-827 (EGS/DAR), 2022 WL 1719001, at *18 (D.D.C. May 27, 2022), *rev'd and remanded on other grounds*, 101 F.4th 909 (D.C. Cir. 2024) (same); *cf. Inst. for Energy Rsch. v. FERC*, No. 22-cv-2114 (BAH), 2023 WL 6121878, at *9 (D.D.C. Sept. 19, 2023) (rejecting Exemption 5 invocation where the agency defended withholding calendar entries in "general categories of redactions" alongside "sweeping, non-specific claims"); *Am. Oversight v. USPS*, No. 20-cv-2580 (RC), 2021 WL 4355401, at *9 (D.D.C. Sept. 23, 2021) (declining to recognize Exemption 5 withholding as to calendar entries where the agency "[did] not provide even a general description of the specific subject matter of each calendar entry at issue").

Plaintiff also seems to fundamentally challenge whether the SEC and the White House can engage in a decision-making process protected by the privilege. It says that "the SEC purports to be an independent agency that does not take direction from the White House," so "[q]uery then what role in the deliberations of such an independent agency . . . the White House might have." Pl.'s Opp'n at 8. Even accepting Plaintiff's characterization of the SEC as "independent," courts have held that communications between agencies and the White House can be subject to the privilege. *See Jud. Watch, Inc. v. CFPB*, 60 F. Supp. 3d 1, 10 (D.D.C. 2014) (holding that communications between the White House and the Consumer Protection Financial Bureau were subject to Exemption 5). And some of the entries relate to decisions to be made by the White House, *see* pgs. 3–4 *supra*, which plainly are covered by the privilege. *See Jud. Watch, Inc. v. U.S. Dep't of Energy*, 412 F.3d 125, 130 (D.C. Cir. 2005) ("[W]e think it inconceivable[] the Congress intended Exemption 5 to protect the decision-making processes of the Executive Branch when the decision is to be made by 'agency' officials subject to oversight by the President and not when the decision is to be made by the President himself and those same agency officials are acting in aid of his decision-making processes.").[1]

Plaintiff also questions the withholdings on the ground that the record descriptions prevent the court from determining whether the "policy decisions are just too trivial" and therefore fall outside the privilege. Pl.'s Opp'n at 9. This argument overlooks the topics identified in the *Vaughn* index that establish the non-triviality of the policy discussions at hand. They include: "climate-related matters," "data gathering project to support regulatory matters," the "SEC's comments on a White House draft document," planning for a "non-public interagency policy committee meeting

---

[1] For this same reason, the court rejects Plaintiff's contention that the SEC has waived the privilege "by sharing the underlying documents with the White House, even as it simultaneously claims to exist as an independent agency not subject to the president's direction and control." Pl.'s Opp'n at 11.

and policy development," "a non-public meeting about potential executive actions," the "SEC's submission to the Deputies Committee about potential executive and agency actions," and "a future White House action." *See* pgs. 3–4 *supra*.  And, even as to those entries that do not specify a subject matter, the court must presume that the agency has acted in good faith and not invoked the privilege to protect trivial matters.  *See SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).  Plaintiff has offered no evidence to rebut the presumption.

**B.**

Plaintiff further complains that the *Vaughn* indices' descriptions of "what type of decisionmaking process [the documents] relate to" is "too vague."  Pl.'s Opp'n at 10; *see also id.* 12–14.  As noted earlier, "[a]ssessing whether a record is pre-decisional or deliberative necessarily requires identifying the decision (and the associated decisional process) to which the record pertains."  *CREW*, 45 F.4th at 972.  Some *Vaughn* entries satisfy that standard.  For example, one email communication is described as containing a "discussion between White House and SEC staff concerning development of climate-related policies and whether to include certain government staff in an upcoming conversation.  The withheld information reflects deliberations on how to address climate issues."  Ex. 1 at 1, entry 2.  Another communication is "about an SEC call with the Ukrainian National Securities and Stock Market Commission and potential follow-up action."  *Id.* at 12, entry 30.  Such entries are sufficiently descriptive to sustain the agency's withholdings.

But those entries are the exception.  The vast majority do not identify the subject of the policy under consideration and instead refer only to policymaking in general.  *See, e.g., id.* at 2, entry 4 ("what public policy issue to focus on"); 4, entry 8 ("possible SEC action on a particular policy issue"); 8, entry 19 ("potential executive and agency actions").  The failure to offer even a high-level description of the policies under consideration makes it difficult to evaluate the decision

8

to which the record relates and its role in the process. *See Senate of the Commonwealth of Puerto Rico*, 823 F.2d at 585 (stating that the "briefest of references to [a record's] subject matter . . . will not do.").

To ensure that such records meet the requirements of the privilege, the court will exercise its discretion and review them *in camera*. *See Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978) (holding that the district court has the discretion to conduct an *in camera* review if "needed in order to make a responsible de novo determination on the claims of exemption"). The court identifies below the records it will review.

### C.

Finally, Plaintiff contests that the SEC has satisfied its burden to establish "foreseeable harm" from release of the withheld records. Because the court will review the undisclosed email communications *in camera*, it defers ruling as to those records. The court, however, will consider the argument as to the calendar entries.

The foreseeability requirement "[i]n the context of withholdings made under the deliberative process privilege . . . means that agencies must concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations." *Reps. Comm.*, 3 F.4th at 369–70 (citation omitted). "A perfunctory statement that disclosure of all the withheld information— regardless of category or substance—would jeopardize the free exchange of information between senior leaders within and outside of the agency will not suffice." *Id.* at 370 (cleaned up) (citation omitted). "Instead, what is needed is a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward. Naturally, this inquiry is context specific." *Id.* (collecting cases).

The withheld calendar entries reflect information about aspects of and proposed language for the SEC's climate-related rules.  Ex. 2.  Tallarico explains that identifying the "subject matter of and issues to be discussed in meetings" was an "efficient way for staff to clarify for Chair Gensler what his many meetings each day are about" and facilitated his "engagement in those meetings on varied topics."  Tallarico Decl. ¶ 19.  Tallarico continues that, if this information were disclosed, "staff across the SEC would likely limit the information they include in calendar entries to prevent disclosure of information that would reflect the nature of Chair Gensler's and SEC staff's deliberations about what to include in proposed rulemaking and what issues required high-level discussions."  *Id.*  Further, if staff were to self-censor, "it would make it more difficult for staff, including the Chair, to keep track of and prepare for meetings" and "impede efficient coordination between SEC staff on rulemaking and other agency initiatives."  *Id.*  Tallarico also states that one of the calendar entries contains an internal SEC email thread that "reflects discussion about language in and edits to a draft of SEC climate-related rules."  *Id.* ¶ 20.  Disclosure of that calendar entry would "chill discussions regarding future SEC proposed rulemaking" and "likely limit [staff] discussions and inhibit their candor in discussing aspects of proposed rulemaking."  *Id.*

These descriptions satisfy the foreseeable harm standard.  They are far cry from the "scanty" descriptions of harm that the D.C. Circuit rejected in *Reporters Committee*.  3 F.4th at 370.  Instead, Tallarico's explanation of harm is specific to the documents at issue, the content withheld, and the specific harm that will follow from disclosure going forward.  That suffices to make out a "focused and concrete demonstration" of foreseeable harm.  *Id.*

## IV.

For the foregoing reasons, the court grants the SEC judgment with respect to the calendar entries.  As to the email communications, the court orders the agency to produce all records for *in camera* review by April 9, 2025, except Entries 2, 3, and 30.

Dated:  March 26, 2025

Amit P. Mehta
United States District Judge